COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Friedman and Callins
Argued at Richmond, Virginia


BOARD OF SUPERVISORS OF
 PRINCE EDWARD COUNTY, VIRGINIA
                                                            MEMORANDUM OPINION[*] BY
v.        Record No. 0490-23-2                      JUDGE DOMINIQUE A. CALLINS
                                                                    APRIL 8, 2025
CAROLYN F. BOWMAN, ET AL.


                    FROM THE CIRCUIT COURT OF PRINCE EDWARD COUNTY
                                  J. Leyburn Mosby, Jr., Judge Designate

                 Andrew McRoberts (Maxwell C. Hlavin; Andrew P. Selman; Sands
                 Anderson PC, on brief), for appellant.

                 Bradley D. Foster (Robert E. Hawthorne; Derrick P. Fellows;
                 Hawthorne & Hawthorne, P.C., on brief), for appellees.


        This dispute centers on Carolyn and Corbett Bowman's construction of a flagpole on their

property in Prince Edward County, Virginia (the "County"). Following the County's issuance of a

notice of violation to the Bowmans concerning their flagpole, the Bowmans appealed to the Board

of Zoning Appeals (the "BZA"). The BZA granted the Bowmans' appeal and invalidated the notice

of violation, finding that the Bowmans' rights in the flagpole had vested pursuant to Code

§ 15.2-2311(C). The Board of Supervisors of Prince Edward County (the "Board") appealed the

BZA's decision to the Circuit Court of Prince Edward County, which affirmed the decision of

the BZA.

---

[*] This opinion is not designated for publication. See Code § 17.1-413(A).

On appeal, the Board contends that the circuit court erred by finding that the Bowmans' rights in the flagpole had vested pursuant to Code § 15.2-2311(C). We disagree. Accordingly, and for the following reasons, we affirm the judgment of the circuit court.

BACKGROUND

The Bowmans own property in Prince Edward County known as Tax Map Parcel No. 039-A-30. According to the property tax card issued by the County, the designated "Use/Class" of the Bowmans' property is solely "Agricultural."

In November 2021, Susan Holyfield, a friend of the Bowmans, emailed Robert Love, the assistant zoning administrator for the County, inquiring on behalf of the Bowmans about the requirements to install a flagpole. Holyfield did not disclose the Bowmans' identity, the details of the project, nor the location of their property. Holyfield did, however, state that the Bowmans' "property is zoned A2." Love responded to the email, informing Holyfield that there were no height restrictions in zone A2 and that the "Building Code Office" would need to answer whether a building permit was required.

Following Holyfield's communication with Love, the Bowmans submitted a building application to the then-building official for the County, Coy W. Leatherwood. The application listed the work description as "[f]lag pole installation" and included "turn by turn directions" to the job site. The Bowmans' application identified their address and tax-map parcel number, but it did not identify their property zoning.

On December 15, 2021, Leatherwood issued a building permit to the Bowmans for the flagpole installation. Sixty days from December 15, 2021, would have fallen on February 14, 2022. Under the permit number and date of issuance is a statement typed in prominent lettering: "THIS PERMIT IS ISSUED IN ACCORDANCE WITH THE ORDINANCE ON BUILDING PERMITS AND THE ZONING ORDINANCE OF Prince Edward County." The permit also includes

- 2 -

directions to the building site, a description of the nature of the work to be done ("FLAG POLE INSTALLATION") and reference to a "plot plan" submitted with the building permit application. Leatherwood's secretary signed Leatherwood's name on the Bowmans' building permit. Thereafter, the Bowmans began installing the flagpole. In January 2022, the County certified that the flagpole's concrete footing passed inspection. The inspection certificate also identified the Bowmans' property zoning as "Agricultural Conservation."

Once construction was completed, the Bowmans displayed a flag[1] on their flagpole. After receiving complaints from area residents, Love issued a notice of violation to the Bowmans regarding the flagpole. The notice stated that the Bowmans' property was in the "General Commercial (C1)" zoning district and that their property could have a flagpole as an "accessory use, but only along with a principal use of the site permitted under the zoning ordinance." The notice further stated that the property was being used for agricultural purposes, "which is not allowed in the C1 zoning district," and that the flagpole's 60-foot height[2] exceeded the maximum allowable height of 25 feet in the C1 district. The notice demanded that the Bowmans remove the flagpole within thirty days and informed them that they had the right to appeal.

The Bowmans appealed the notice to the BZA, arguing that their rights in the flagpole had vested pursuant to Code § 15.2-2311(C) and that removal of the flagpole was in violation of their First Amendment rights.[3] The day of the BZA hearing, Phillip Moore, who succeeded Leatherwood as building official, issued an internal memorandum "modify[ing] all previously-issued and future building permits" to "exclude the words, 'and the zoning ordinance'" from the statement about the

---

[1] The Bowmans displayed a confederate flag on their flagpole.

[2] In a Facebook post, Mrs. Bowman stated that the flag was 85 feet tall.

[3] Whether removal of the flagpole violated the Bowmans' First Amendment rights is not an issue raised in this appeal.

permits' compliance with ordinances. He also struck the same language on a copy of the Bowmans' previously-issued permit, initialing the modification.

At the hearing before the BZA, Love testified for the Board that the property where the Bowmans' flagpole was located was zoned C1. The remainder of the property was zoned "A2 Agricultural conservation." Love also testified that the flagpole was taller than 25 feet.

Love continued that only he and the zoning administrator, Doug Stanley, had authority to review, issue, and deny zoning permits, and a building official did not have such authority. Love had neither reviewed the Bowmans' building permit application nor "signed off on [the permit] including the language on the building permit that talks about compliance with zoning." Finally, Love testified that the zoning compliance language was a "clerical error."

Stanley likewise testified that only he and Love had the authority to determine zoning compliance. Stanley stated that the building permit had a clerical error, which he described as "approving something with unintended consequences" or "approving something you did not mean to approve." He further characterized the issuance of the Bowmans' building permit as "a non-[z]oning [a]dministrator or [a]ssistant [z]oning [a]dministrator approving the zoning for a building permit."

Moore, Leatherwood's successor and the County's current building official, testified that he is not authorized to "sign-off on zoning compliance." Moore conducted the Bowmans' footing inspection; he did not know the flagpole height when he inspected the footing but testified that the footing was "very large." According to Moore, it was not Leatherwood but his secretary who signed the Bowmans' building permit. Moore did not know whether Leatherwood had authorized his secretary to sign the building permit in question but acknowledged that the building official's secretary was authorized to sign building permits.

Following testimony, the Board argued that the building permit was not issued by a zoning administrator or "other administrative officer" because neither Leatherwood nor his secretary were authorized to determine zoning compliance. It also contended that the statement contained in the building permit about zoning was a "clerical error." Thus, the Board contended that the Bowmans' rights in the flagpole had not vested pursuant to Code § 15.2-2311(C).

The Bowmans argued that Leatherwood was an "other administrative officer" under Code § 15.2-2311(C) and that the building permit was an "order, requirement, decision or determination" so as to establish the Bowmans' vested rights in the flagpole. The Bowmans also disputed the Board's evidence that the flagpole was zoned C1, contending that the Board's records were in conflict as to the zoning district to which their property belonged.

After considering the evidence and arguments, the BZA overturned the violation notice based on its finding that the Bowmans' rights had vested pursuant to Code § 15.2-2311(C). Thereafter, the Board petitioned the Circuit Court of Prince Edward County for review, asserting that the Bowmans had not proven a vested right under Code § 15.2-2311(C), that the building permit was void ab initio, and that the zoning language in the building permit was a clerical error. The Board also argued that the flagpole was not a valid accessory use and that it exceeded the maximum allowable height in the C1 district.

At a hearing before the circuit court, the Board argued that the building permit was not issued by an official authorized to make zoning decisions and did not authorize a particular height or location for the flagpole. Instead, it "generic[ally] mention[ed]" zoning. The Board also contended that the Bowmans had not relied in good faith on the building permit. Further, it argued that the zoning language on the building permit was a clerical error that occurred "well in advance of the approval in question."

- 5 -

The Board opined that the County's building permit form had been adopted from a form used by a county in which "the building official and zoning administrator are the same person." The Board argued that the form had not been "adapted correctly when it was brought to Prince Edward County," resulting in the language regarding zoning approval being erroneously left on the form. It contended that Leatherwood's secretary could have corrected the alleged clerical error in the building permit form if she had "read the document and struck through the 'of zoning ordinance language.'" The Board argued that the secretary committed a second clerical error by "not reading the thing and making it correct to what her authority and instruction had been." The Board maintained that Moore's memorandum and modification of the building permit demonstrated that the inclusion of language referencing zoning was a clerical error. The Bowmans argued that the statute's reference to "other administrative officer" included Leatherwood, who validly issued their building permit.

In March 2023, the circuit court entered an order finding that the Bowmans had established a vested right in the flagpole under Code § 15.2-2311(C) and affirmed the decision of the BZA. The Board appeals.

ANALYSIS

The Board contends that the circuit court erred in finding that the Bowmans' rights in the flagpole had vested pursuant to Code § 15.2-2311(C).[4] Specifically, the Board argues that the

---

[4] On appeal, the Board also assigns error (assignments of error numbers 13 and 14) to the circuit court's determinations "in not holding that the building permit is void *ab initio*" considering "the lack of any authority whatsoever" to issue a zoning decision, and in failing to hold that "any purported zoning approval on the building permit [was] void *ab initio*."

Because we hold that the Bowmans' rights in the flagpole have vested pursuant to Code § 15.2-2311(C), we need not address the Board's arguments about whether the building permit is void ab initio. *See Bd. of Supervisors of Richmond Cnty. v. Rhoads*, 294 Va. 43, 52 (2017) (holding that because a "[c]ertificate granted a right to use property in a manner that otherwise would not have been allowed under the Zoning Ordinance," the circuit court did not err in rejecting a party's claim that the certificate was void ab initio).

Bowmans' rights did not vest under this statute for four reasons: (1) the building permit is not a "written order, requirement, decision or determination"; (2) Leatherwood, as the building official, is not an "other administrative officer"; (3) the inclusion of the words "and the zoning ordinance" in the building permit is clerical error; and (4) the Bowmans did not demonstrate good faith reliance on the action of a zoning administrator or other administrative officer. Because we disagree, we affirm the circuit court's judgment.

"In an appeal from a circuit court decision reviewing a determination by a board of zoning appeals, 'this Court accords a presumption of correctness to the circuit court's factual findings but reviews its conclusion of law de novo.'" *Prince William Bd. of Cnty. Supervisors v. Archie*, 296 Va. 1, 9 (2018) (quoting *W&W P'ship v. Prince William Cnty. Bd. of Zoning Appeals*, 279 Va. 483, 486 (2010)).

Questions of statutory interpretation present "pure question[s] of law which we review de novo." *Stanton v. Beach*, 79 Va. App. 587, 592 (2024) (quoting *Ford Motor Co. v. Gordon*, 281 Va. 543, 549 (2011)). "When interpreting a statute or ordinance, 'our primary objective is "to ascertain and give effect to legislative intent," as expressed by the language used in the statute.'" *Berry v. Bd. of Supervisors*, 302 Va. 114, 127 (2023) (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)). "'[W]e determine [that] intent from the words contained in the statute' or ordinance." *Id.* at 128 (alterations in original) (quoting *Williams v. Commonwealth*, 265 Va. 268, 271 (2003)). "[W]ords in a statute [or ordinance] are to be construed according to their ordinary meaning, given the context in which they are used." *Id.* (alterations in original) (quoting *City of Va. Beach v. Bd. of Supervisors*, 246 Va. 233, 236 (1993)).

"[I]n limited circumstances, private landowners may acquire a vested right in planned uses of their land that may not be prohibited or reduced by subsequent zoning legislation." *Norfolk 102,*

*LLC v. City of Norfolk*, 285 Va. 340, 353 (2013) (alteration in original) (quoting *Bd. of Zoning Appeals v. CaseLin Sys., Inc.*, 256 Va. 206, 210 (1998)). The General Assembly acted to codify one such limited circumstance in Code § 15.2-2311(C), which provides in relevant part:

> In no event shall a written *order, requirement, decision or determination* made by the zoning administrator *or other administrative officer* be subject to change, modification or reversal by any zoning administrator or other administrative officer after 60 days have elapsed from the date of the written order, requirement, decision or determination where the person aggrieved has materially changed his position *in good faith reliance* on the action of the zoning administrator or other administrative officer . . . *[t]he 60-day limitation period shall not apply in any case where*, with the concurrence of the attorney for the governing body, *modification is required to correct clerical errors*.

(Emphases added). Indeed, "[b]y its plain terms, the prerequisites for Code § 15.2-2311(C) to apply are: (1) a 'written order, requirement, decision or determination made by the zoning administrator;' (2) the passage of at least 60 days from the zoning administrator's determination; and (3) a material change in position 'in good faith reliance on the action of the zoning administrator.'" *Bd. of Supervisors of Richmond Cnty. v. Rhoads*, 294 Va. 43, 50 (2017) (quoting Code § 15.2-2311(C)).

Characterizing it as a "remedial statute," our Supreme Court has recognized that "[t]he plain language of Code § 15.2-2311(C) indicates that the statute is intended to eliminate the hardship property owners have suffered when they rely to their detriment upon erroneous or void zoning decisions." *Id.* at 51. Remedial statutes are "'liberally construed so that the purpose intended may be accomplished,' and [are] to be 'read so as to promote the ability of the enactment to remedy the mischief at which it is directed.'" *Id.* (quoting *Manu v. GEICO Cas. Co.*, 293 Va. 371, 389 (2017)); *see also Pompell v. Commonwealth*, 80 Va. App. 474, 481 (2024) ("This remedial statute[, Code § 19.2-231,] is to be construed liberally."). "All other rules of construction are subservient to that intent." *Neal v. Fairfax Cnty. Police Dep't*, 295 Va. 334, 344 (2018) (quoting *Univ. of Va. v. Harris*, 239 Va. 119, 124 (1990)). Given the remedial character of the statute and our obligation of

liberal interpretation as we seek to ascertain the legislature's intent, we address the Board's four primary arguments.

I.  A "Written Order, Requirement, Decision or Determination"

Per the plain language of Code § 15.2-2311(C), the Bowmans' rights may vest in the flagpole only if a zoning administrator or other administrative officer makes "a written order, requirement, decision or determination."  Code § 15.2-2311(C).  The Board argues that the building permit[5] is not an order, requirement, decision or determination because the building permit "was never reviewed, modified, approved, or signed by the zoning administrator."  Citing the Virginia Supreme Court decision in *Board of Supervisors of Stafford County v. Crucible, Inc.*, 278 Va. 152 (2009), the Board additionally asserts that because the building permit did not contain "an explicit verification of zoning" or otherwise contain construction details so as to indicate specifically that the project would be contrary to zoning laws, the building permit is insufficient to constitute an order, requirement, decision or determination which establishes a vested right pursuant to Code § 15.2-2311(C).

In response, the Bowmans assert that the Supreme Court's decision in *Board of Supervisors of Richmond County v. Rhoads* forecloses the Board's arguments on specificity, squarely holding that "[s]uch specificity is not required by Code § 15.2-2311(C)" and is thus irrelevant to determining whether the building permit constitutes an order, requirement, decision or determination.  294 Va. at 52.  We agree with the Bowmans.

The intersection of regulation of building construction and zoning compliance is hardly a new consideration.  In *Segaloff v. City of Newport News*, 209 Va. 259 (1968), our Supreme Court recognized that

---

[5] The parties do not dispute that the only writing considered by this Court to satisfy the "order, requirement, decision or determination" element is the building permit.  Thus, the email communications between Susan Holyfield and Robert Love are not considered in this analysis.

> [i]t is *well-established* that a municipality, under valid zoning ordinances, may require that permits be obtained from designated public officials as a prerequisite to the erection of buildings or similar structures. When a municipality grants such a permit, it is acting in its governmental, not proprietary, capacity and is not estopped as the result of its acts or those of its agents or employees.

*Id.* at 261 (emphasis added) (citations omitted). Thus, a crucial aspect to the erection of buildings or structures is the relationship between the issuance of permits and compliance with local zoning ordinances.

Prior to the Supreme Court decision in *Rhoads*, courts deemed building permits issued in conflict with applicable zoning ordinances "void and confer[ring] no right[s] on the permittee, even though issued in good faith." *Blacksburg v. Price*, 221 Va. 168, 171 (1980) (holding that a building permit "issued at variance with an existing zoning ordinance" was void ab initio); *see also WANV, Inc. v. Houff*, 219 Va. 57, 64 (1978) (following *Segaloff* to affirm trial court judgment holding that a building permit issued in violation of a zoning ordinance was void); *Segaloff*, 209 Va. at 262 (relying on *Lowry v. City of Mankato*, 42 N.W.2d 553, 559 (Minn. 1950), "where the court said: 'A building permit issued in violation of a zoning ordinance by an official lacking power to alter or vary the ordinance is void, and the zoning regulation may be enforced notwithstanding the fact that the permittee may have commenced building operations.'"). Indeed, in *Segaloff* the Court held that although an "application did set forth that the building would comply with the ordinances of the City . . . , the officials of the City could not have authorized a violation of the zoning ordinance and any permit issued for such a violation would be invalid." 209 Va. at 262. The Court reemphasized this principle in *WANV, Inc.* and *Blacksburg*, where it held that the building permits, although issued by zoning administrators, were void where they were issued in violation of a local zoning ordinance.

In 1995 the General Assembly amended Code § 15.2-2311 to include subsection C. *See* 1995 Va. Acts ch. 424. Thereafter, in *Rhoads*, the Supreme Court pointedly explored the purpose of the subsection. The Court stated that Code § 15.2-2311(C) is to be "'liberally construed so that the purpose intended may be accomplished,'" that is, to "provide relief and protection to property owners who detrimentally rely in good faith upon *erroneous* zoning determinations and who would otherwise suffer loss because of their reliance upon the zoning administrator's error." *Rhoads*, 294 Va. at 51 (emphasis added) (quoting *Manu*, 293 Va. at 389). In so doing, the Court held that "Code § 15.2-2311(C) manifestly creates a legislatively-mandated limited exception to the judicially-created general principle that a *building permit* issued in violation of applicable zoning ordinances is void." *Id.* at 52 (emphasis added). Thus, it follows that *Rhoads*, building upon *Segaloff*, *WANV, Inc.*, and *Blacksburg*, stands for the proposition that a building permit is an order, requirement, decision or determination for purposes of Code § 15.2-2311(C) even where it is issued in violation of a local zoning ordinance. In other words, contrary to the contention of the Board, that a zoning determination is issued erroneously or without proper authority is not dispositive of whether it is in fact a determination (or order or requirement or decision) indicating zoning compliance.

Here, the Bowmans' building permit expressly states that its issuance is "IN ACCORDANCE WITH THE ORDINANCE ON BUILDING PERMITS AND THE ZONING ORDINANCE OF Prince Edward County." On its face, the building permit affirmatively asserts compliance with the County's zoning ordinance and confirms that such compliance is the basis for its issuance. *Cf. Rhoads*, 294 Va. at 52 ("In issuing the [certificate of compliance], the zoning administrator necessarily made a determination that the building plans complied with the

- 11 -

Zoning Ordinance in all respects.").[6]  Yet even assuming arguendo, as the Board suggests we do, that this language does not constitute an "explicit verification of zoning," we reject the Board's argument that such "explicit verification" is necessary to recognize the building permit as a determination under Code § 15.2-2311(C).  Although the Bowmans' building permit includes directions to the building site, a description of the nature of the work to be done ("FLAG POLE INSTALLATION") and reference to a "plot plan" which was submitted with the building permit application, the *Rhoads* Court concluded that such specificity was "irrelevant" as it was "not required by Code § 15.2-2311(C)."  *Rhoads*, 294 Va. at 52.  And we so conclude here.  The building permit issued to the Bowmans was an "order, requirement, decision or determination" under Code § 15.2-2311(C).

II.  "Other Administrative Officer"

We next consider whether the County official who issued the Bowmans' building permit was an "other administrative officer" as contemplated under Code § 15.2-2311(C)."[7]  The Board argues that Leatherwood, the then-building official, was not an "other administrative officer" under the statute because an "administrative officer" as contemplated under the statute "is one who is authorized to and is carrying out zoning duties."  The Board contends that interpreting Code § 15.2-2311(A), (B), and (C) together "makes clear" that the phrase "other administrative

---

[6] We acknowledge there is some ambiguity in the phrase "in accordance with the ordinance on building permits and the zoning ordinance of Prince Edward County" in that it is unclear whether the phrase conveys that the building permit itself complies with the ordinances, or whether it confirms that it purports to deem the contents of the permit compliant with relevant ordinances.  We need not decide which interpretation is correct, however, as the building permit was issued erroneously.

[7] Although the statute provides that the written order, requirement, decision or determination may be made by "the zoning administrator *or* other administrative officer," Code § 15.2-2311(C) (emphasis added), it is undisputed that Leatherwood was not a "zoning administrator."  Thus, we limit our analysis to consider solely whether Leatherwood, the building official, was an "other administrative officer" under Code § 15.2-2311(C).

- 12 -

officer" cannot be a building official. The Board further argues that "[a]ny other reading . . . leads to absurd results," including the potential that "every administrative officer employed by a locality" could be deemed an administrative official capable of binding a locality on zoning decisions.

The Bowmans' response is two-fold: first, that an administrative officer empowered to issue building permits qualifies as an other "administrative officer in the administration or enforcement of this article" under Code § 15.2-2311(A) because a locality's authority to issue building permits is found within the same article; and second, that the broad scope of the plain language of Code § 15.2-2311(C) can be reasonably construed to encompass a building official as an "other administrative officer." Again, we agree with the Bowmans.

As a starting point for our analysis, we first consider the "plain meaning" of the statutory language.[8] "The standard for interpreting a statute is well-established . . . courts must apply plain language when it is unambiguous and its application does not lead to an absurd result." *City of Charlottesville v. Payne*, 299 Va. 515, 532 (2021). Moreover, we operate under the assumption that the legislature chose the words in a statute with care. *Wal-Mart Stores E., LP v. State Corp. Comm'n*, 299 Va. 57, 70 (2020). Code § 15.2-2311(C) requires that, to support a property owner's claim of vested rights, the written decision or determination upon which they rely be made by a "zoning administrator *or* other administrative officer." (Emphasis added). Indeed, the statute offers two categories of authorized official who may issue a qualifying determination ("zoning administrator" and "other administrative officer") separated by the disjunctive "*or*," indicating that one or the other suffices. *See Pittman v. Commonwealth*, 69 Va. App. 632, 636

_____

[8] We do so while also cognizant of the remedial character of the statute and our obligation to construe it liberally and thus remedy the "mischief" the General Assembly originally enacted Code § 15.2-2311(C) to address. *See Rhoads*, 294 Va. at 51.

(2019) (explaining that the disjunctive word "or" demonstrates "the availability of alternative choices").

We further assume that the legislature chose the word "other" with care in crafting the phrase "*other* administrative officer." Code § 15.2-2311(C) (emphasis added). "Other" is defined as "different from that or those implied or specified," *Other*, *American Heritage Dictionary* (Houghton Mifflin, 5th ed. 2011), and "denot[es] a person or thing that is different or distinct from one already mentioned or known about," *Other*, *Oxford Language Dictionary* (2024). It follows that an "other administrative officer" refers to an administrative officer *other than* a zoning administrator. Thus, we are unpersuaded by the Board's argument that the term "other administrative officer" is necessarily limited to an administrative officer who deals solely with *zoning*. Such an interpretation renders the term "other administrative officer" redundant. *See Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014) ("We adhere to rules of statutory construction that discourage any interpretation of a statute that would render any part of it useless, redundant or absurd. Instead, we seek to read statutory language so as to give effect to every word."). Although the parties do not dispute that Leatherwood, the building official, had no authority to make zoning determinations, this fact is not dispositive of how we interpret the term "other administrative officer" in the context of Code § 15.2-2311(C). As discussed *supra*, the purpose of Code § 15.2-2311(C) is to provide redress for a property owner who unwittingly relies to their detriment on an erroneous zoning determination. There is perhaps nothing more emblematic of an erroneous zoning determination than one rendered by an official lacking authority to do so.

Further, other provisions of Code § 15.2-2311 and within Article 7 generally support this interpretation. Code § 15.2-2311(A) states that:

> An appeal to the board may be taken by any person aggrieved or by any officer, department, board or bureau of the locality affected

- 14 -

> by any decision of the zoning administrator or from any order, requirement, decision or determination made by *any other administrative officer in the administration or enforcement of this article*, any ordinance adopted pursuant to this article, or any modification of zoning requirements pursuant to § 15.2-2286.

(Emphasis added). We agree with the Bowmans that Article 7—wherein Code § 15.2-2311 is contained—encompasses administrative officers empowered to issue building permits. Indeed, Code § 15.2-2313 provides that:

> *Where a building permit has been issued* and the construction of the building for which the permit was issued is subsequently sought to be prevented, restrained, corrected or abated as a violation of the zoning ordinance, by suit filed within fifteen days after the start of construction by a person who had no actual notice of the issuance of the permit, the court may hear and determine the issues raised in the litigation even though *no appeal was taken from the decision of the administrative officer to the board of zoning appeals*.

(Emphases added). Thus, the General Assembly envisioned and intended that an "administrative officer" would issue a building permit, that the permit would constitute a "decision of the administrative officer," and that an appeal could be taken from the issuance of the building permit to the BZA. Moreover, Code § 15.2-2286 demonstrates that the issuance of permits, in addition to other enumerated tasks, constitutes the "administration or enforcement" of Article 7. For example, Code § 15.2-2286(A)(4) permits a zoning ordinance to include "reasonable regulations and provisions" for various matters, including, "[f]or the administration and enforcement of the ordinance including the appointment or designation of a zoning administrator *who may also hold another office in the locality*." (Emphasis added). Code § 15.2-2286(A)(6) states that regulations and provisions may include the collection of fees, the issuance of permits, and the advertising of notices and other expenses. Code § 15.2-2286(A)(8) provides that regulations and provisions may include "submission and approval of a plan of development prior to the issuance of building permits to assure compliance with regulations contained in such

- 15 -

zoning ordinance."  In other words, any official or public officer other than the zoning administrator himself, empowered with authority to perform or enforce promulgations of Article 7 may rightly be deemed an "other administrative officer" under Code § 15.2-2311(C).  *See Berry*, 302 Va. at 128 ("[W]e do not view [multiple legislative enactments] 'as isolated fragments of law, but as a whole, or as parts of a great connected, homogeneous system, or a single and complete statutory arrangement.'" (quoting *Thorsen v. Richmond Soc'y for the Prevention of Cruelty to Animals*, 292 Va. 257, 266 (2016))).  Simply put, an administrative officer, such as a building official, empowered to perform administrative or enforcement functions pursuant to Article 7 is an "other administrative officer."

Contrary to the Board's contention, such a construction does not lend itself to an absurd result.  We do not interpret "other administrative officer" so expansively as to include, as the Board suggests hyperbolically, "*every* administrative officer employed by a locality, whether in the social services, animal shelter, police, parks and recreation, sanitation, or other department."  An official conferred with authority to issue building permits in accordance with Article 7 and a locality's zoning ordinances is an administrative officer under Code § 15.2-2311(C).  And where an individual so conferred is an official other than the zoning administrator, that official is an "other administrative officer."  Thus Leatherwood, as the building official for Prince Edward County and authorized to issue a building permit bearing the declaration, "THIS PERMIT IS ISSUED IN ACCORDANCE WITH THE ORDINANCE ON BUILDING PERMITS AND THE ZONING ORDINANCE OF Prince Edward County" was an "other administrative officer" pursuant to Code § 15.2-2311.[9]

---

[9] In its eighth assignment of error, the Board argues that the circuit court erred because "a secretary to a building official unauthorized to issue a Zoning Decision" is not an "other administrative officer."  At the BZA hearing, Moore, the successor building official, acknowledged that Leatherwood's secretary had the authority to sign and issue building permits.

- 16 -

III. Good Faith Reliance

To obtain a vested right pursuant to Code § 15.2-2311(C), a property owner must "materially change[] his position in good faith reliance on the action of the zoning administrator or other administrative officer."[10]  The Board contends that the Bowmans did not act in good faith reliance because: (1) the documents the Bowmans provided do not name the correct zoning district, location or height of the flagpole; (2) the Bowmans gave incorrect and inadequate information for the flagpole construction, including their zoning district; (3) a zoning administrator or other administrative officer did not approve the building permit; (4) the Bowmans did not seek to have zoning officials sign off on the building permit; and (5) the Bowmans failed to apply for a zoning permit, as required by law.  The Board's arguments lack merit.

The term "good faith reliance" is not defined in Code § 15.2-2311(C).  "Where a 'statute's terms are undefined' by the legislature, we give those terms 'their "ordinary meaning" in light of "the context in which [they are] used."'  In ascertaining such meaning, dictionary definitions and pertinent analysis in prior case law may be consulted." *Eley v. Commonwealth*, 70 Va. App. 158, 165 (2019) (alteration in original) (quoting *Va. Marine Res. Comm'n v. Chincoteague Inn*, 287 Va. 371, 384 (2014)).  Black's Law Dictionary defines "good faith" as a "state of mind consisting [of] honesty in belief or purpose" or the "absence of the intent to defraud or to seek unconscionable advantage." *Good Faith*, *Black's Law Dictionary* (11th ed. 2019).  The same dictionary defines "reliance" as "[d]ependence or trust by a person, especially when combined with action based on

_____

Thus, for purposes of our analysis, whether the building official or his secretary signed the Bowmans' building permit is a distinction without difference.

[10] The Board does not dispute that the Bowmans "materially changed [their] position" as required by Code § 15.2-2311(C).  Rather, the focus of the Board's assignment of error 11 is whether the Bowmans relied *in good faith* on an action of a zoning administrator or other administrative officer.

- 17 -

that dependence or trust." *Reliance*, *Black's Law Dictionary*, *supra*. Consistent with these definitions, this Court has advised that "[a]n act is deemed to have been committed in good faith if it is done honestly and without fraud or deceit." *Dep't of Pro. & Occupational Regul. v. Abateco Servs.*, 33 Va. App. 473, 480 (2000) (distinguishing "good faith" from "willfulness"). Thus, it stands to reason that, in the context of Code § 15.2-2311(C), a property owner's "good faith reliance" is measured by whether he materially changes his position in an honest dependence on the legality of the zoning action and without intent to defraud, deceive or to obtain an unconscionable advantage.

There is nothing in the record that indicates the Bowmans had actual knowledge that the proposed flagpole installation violated any zoning ordinances. To the contrary, the record demonstrates that the Bowmans, through Holyfield, inquired of Love regarding any restrictions to their erecting a flagpole on their property. In so doing, Holyfield described the property zone consistent with the description provided on the Bowmans' county-promulgated property card— "agricultural." Love responded that the building permit, issued to the Bowmans by the County, identified their property as zone "AGRICULTURAL CONSERVATION." Indeed, the record reflects that, at all times, the Bowmans acted in reliance on the information provided to them by county officials and with permission granted them by county officials.

Moreover, the Board does not allege fraud, deceit or unconscionable advantage by the Bowmans. Instead the Board's primary argument is that "there was no erroneous action of a zoning officer upon which the Bowmans could rely." For the reasons already stated *supra*, we reject this argument. As to the Board's contention that the Bowmans relied upon incorrect documents and provided "incorrect and inadequate information for any approval," even assuming the truth of this contention, the Board's argument is unavailing. The record reflects that the information the Bowmans provided "for any approval" was that provided to them by the

County. An erroneous zoning action authorized based on the County's incorrect or inaccurate records amounts to a lack of diligence and care on the part of the County, not to a lack of good faith reliance on the part of the property owners. The record establishes that the Bowmans acted consistent with the information they sought and received and, thus, acted in good faith reliance.

IV. Clerical Error

The Board urges that, even if the building permit is a qualifying zoning determination of a qualifying administrative officer, the circuit court nonetheless erred because the reference to zoning included in the building permit was a clerical error. The Board contends that for this reason, the 60-day limitation period imposed by the statute does not apply, and Moore's modification of the clerical error precluded the Bowmans from establishing that their rights vested pursuant to Code § 15.2-2311(C). The Board's arguments are unavailing.

In relevant part, Code § 15.2-2311(C) provides that the 60-day period after which a qualifying zoning determination may not be "subject to change, modification or reversal" does "*not* apply in any case where, with the concurrence of the attorney for the governing body, modification is required to correct clerical errors." (Emphasis added). In other words, notwithstanding a property owner's rights vesting in an otherwise erroneous zoning determination, a locality is not precluded from modifying such determination for the sole purpose of correcting clerical errors. This, as it were, exception to the exception does not diminish the finality of the vesting. The 60-day limitation period still operates to vest a property owner's right to stand in good faith reliance on an erroneous zoning determination.

The Board, however, urges us to construe the last sentence of Code § 15.2-2311(C) so as to permit a zoning administrator to post hoc declare an erroneous zoning determination a "clerical error" and thus circumvent the statute's limitations period and, thereby, a property

- 19 -

owner's vested rights. We resist this urging as it is both a strained interpretation of the statute and a contravention of the legislature's intent in enacting the statute.

Although a clerical error "often denotes 'an error made in copying or writing' . . . the term frequently has a broader meaning according to the context in which it is used and the purpose for which it is employed." *Commonwealth v. Richmond-Petersburg Bus Lines, Inc.*, 204 Va. 606, 611 (1963). The term "clerical error" is not defined in Code § 15.2-2311, so we consider how it is defined in similar contexts.

We consider the Supreme Court's analysis in *Commonwealth v. Richmond-Petersburg Bus Lines, Inc.* Interpreting Code § 58-1127, which addressed clerical errors confronted by the State Corporation Commission, our Supreme Court construed the term "literally" to mean "an error committed by a clerk or some subordinate agent in the performance of clerical work." *Richmond-Petersburg*, 204 Va. at 611. In this context, the Court continued, the term "usually denotes negligence or carelessness which is not attributable to the exercise of judicial consideration or discretion." *Id.* Thus, it affirmed the tax refund owed to a common-carrier bus service because "the mistake by which the carrier-applicant was furnished the forms containing the erroneous information was made by a subordinate or clerk in the Commission's Division of Motor Carrier Taxation in the performance of his clerical duties." *Id.*

The Board relies on *Richmond-Petersburg Bus Lines, Inc.*, in support of its position that the inclusion of the phrase "AND THE ZONING ORDINANCE" on the Bowmans' building permit was a "clerical error." This reliance is misplaced. In that case, the error involved the wrong tax information and form being sent to a single entity, while all other entities received the proper information and form. *Richmond-Petersburg*, 204 Va. at 608. The record supported the finding that the mistake of sending the wrong information and form to a single entity was a discrete and distinct error attributable to an individual "in the performance of his clerical duties."

*Id.* at 611. Here, however, the errant phrase, "AND THE ZONING ORDINANCE," used in the Bowmans' building permit was also included in building permits issued to other individuals such that Moore, the successor building official, circulated an internal memorandum directing that all previously issued and future permits have the language struck. The Board itself concluded that the language was the likely result of having adopted a form issued by another locality where the zoning administrator and the building official were the same individual. The systematic issuance of forms containing preprinted language adopted or condoned by one with authority to do so indicates an "exercise of judicial consideration and discretion" and not a mere act of "negligence or carelessness."[11]

Neither are we persuaded by the Board's argument that a secretary of the building official is a "subordinate agent, in the performance of clerical work," and that the secretary committed a clerical error in issuing a building permit "containing an erroneous reference to zoning." In explaining how the secretary of the building official may sign a building permit as opposed to the

---

[11] Our Supreme Court has often grappled with this term as it is used in relation to Code § 8.01-428(B). In this context the Court explained:

> "Scrivener's or similar errors in the record, which are demonstrably contradicted by all other documents, are clerical mistakes." Such errors cause the court's record to fail to "speak the truth." Examples of clerical errors include a typographical error made by a court reporter while transcribing a court proceeding, or an unintended error in the drafting of a divorce decree.

*Wellmore Coal Corp. v. Harman Mining Corp.*, 264 Va. 279, 283 (2002) (citations omitted) (quoting *Zhou v. Zhou*, 38 Va. App. 126, 133 (2002)). Although helpful, this account does not perfectly carry over to the vested rights statute at issue here. Code § 8.01-428(B) addresses the power of a court to correct the record in instances of "[c]lerical mistakes in all judgments or other parts of the record and errors therein." *See Morgan v. Russrand Triangle Assocs., Inc.*, 270 Va. 21, 25 (2005) ("We have held that the power to correct the record under this section is limited to those situations when the record clearly supports such corrections."). The issue before us concerns the authority of a local governing body and its agents to correct clerical errors in its records. Thus, we find the definition used by the Supreme Court in *Commonwealth v. Richmond-Petersburg Bus Lines, Inc.* more appropriate.

official himself, Moore testified before the BZA that this was "because it's already gone through the process where *I've reviewed the permit and then I signed-off approving the permit to be issued*." (Emphasis added). When asked whether a building permit signed by his secretary "would still be an official permit," Moore responded, "Yes. In that case, it would, *because I've signed off and approved it*." (Emphasis added). Because the secretary is not "issuing" the permit but merely signing on behalf of the building official a permit approved for issuance by the building official, the officially *approved* "erroneous reference" hardly constitutes a clerical error. *Cf. Richmond-Petersburg*, 204 Va. at 611 ("[Clerical error] usually denotes negligence or carelessness which is not attributable to the exercise of judicial consideration or discretion.").

Further, as discussed *supra*, Code § 15.2-2311(C) is "remedial in nature," and we are bound to interpret it liberally "so that the purpose intended may be accomplished," and "so as to promote the ability of the enactment to remedy the mischief at which it is directed." *Rhoads*, 294 Va. at 51 (quoting *Manu*, 293 Va. at 389). The purpose of Code § 15.2-2311(C) is to protect property owners who detrimentally rely in good faith upon erroneous zoning determinations and "who would otherwise suffer loss because of their reliance upon the zoning administrator's error." *Id.* To interpret the statute as the Board urges undoubtedly defeats that purpose.

V. Burden of Proof

The Board further argues that the circuit court erred by finding that the Bowmans "satisfied their burden of proof." The Board's argument on this point hinges on its view that "the building permit does not contain the facts the Bowmans need to establish a vested right to the illegal location and height of the flagpole on the Property, let alone grant any sort of approval for any structure of the height in question." In support of its position, the Board heavily relies on *Goyonaga v. Board of Zoning Appeals*, 275 Va. 232 (2008), for the proposition that the "burden [is] on the [landowner] to establish that the plans were plainly contrary to the requirements of the

- 22 -

ordinance, but were nonetheless approved by the zoning administrator." *Id.* at 245 n.5. We disagree.

In *Goyonaga*, a couple sought to expand their home on their lot, both of which were pre-existing non-conforming uses in their zoning district. *Id.* at 236-37. The relevant zoning ordinance provided that rights to non-conforming uses ceased upon the demolition of 75% of the assessed value of the property at issue. *Id.* The property owners obtained a variance to complete the expansion of their home, and although they disclosed their building plans, they failed to explicitly disclose their intention to demolish the entire home in the process. *Id.* at 237, 242 ("[The property owners] contend that . . . the building plans submitted to the city zoning and building officials established that the exterior walls of the home would need to be reinforced in order to comply with current building code standards and the approval of the plans by the city officials constituted 'significant affirmative governmental acts allowing development of a specific project.'" (quoting Code § 15.2-2307)). When the zoning administrator issued a stop work order, litigation ensued. *Id.* at 238-39.

On appeal to our Supreme Court, the property owners argued, among other things, that their rights in the approved building plan "ripened into a vested right 60 days after the approval" under Code § 15.2-2311(C). *Id.* at 243. The Court disagreed. *Id.* at 244-45. It emphasized that "[t]he burden of establishing the vesting of a right to an otherwise impermissible use of property under Code [§] 15.2-2311(C) falls upon the property owner." *Id.* at 244. Thus, the Court concluded that the property owners were "required to show that the zoning administrator, in reviewing the building plans, would have understood that the home at least potentially was to have been completely demolished to its foundation and an entirely new structure was to have been erected in its place," and that they failed to do so. *Id.* ("The building plans do not reflect any such potentiality.").

Contrary to the Board's contentions, the facts presented here are distinguishable from those of *Goyonaga*. In *Goyonaga*, the property owners' failure to disclose an improper use—whether by concealing or failing to disclose material facts regarding the planned use, or other misrepresentations—defeated the property owners' later claim to vested rights under Code § 15.2-2311(C). As we discussed *supra*, the Bowmans relied on their tax card for their understanding that their property was zoned for agricultural use. They similarly relied on statements from Love for their understanding that since their property was zoned for agricultural use, there were no height restrictions on the contemplated flagpole project. At the time of issuance of their building permit in December 2021, the building official was made aware that the Bowmans intended to build a flagpole but did not press further regarding the height of the flagpole. Even after a January 2022 inspection of the flagpole's footing, conducted by Moore, the then-building inspector and successor building official, the County itself made no note of the flagpole's height; indeed, it reaffirmed that the property at issue was zoned for "Agricultural Conservation."

At every turn, the acts and omissions of *the County* reaffirmed the Bowmans' belief that their property was zoned for agricultural use and that they faced no height restrictions as a result. Put differently, there is nothing in the record which indicates that the Bowmans attempted to conceal the height of the flagpole or any other material facts about their intended construction, or that they failed to disclose the height when the County requested the same, unlike what occurred in *Goyonaga*. The "potentiality" for what was later alleged to be an impermissible use was always disclosed to the County; in fact, this "potentiality" only became a reality due to the erroneous representations and determinations made by the County. Given that the record reflects that the County issued the Bowmans' building permit in December 2021, more than 60 days had elapsed before the building officer made an attempt in April 2022 to modify the determination

- 24 -

that the Bowmans could permissibly build their noncompliant flagpole. Hence, we conclude that the Bowmans satisfied their burden of proof in demonstrating that their rights in their impermissible use vested after February 14, 2022.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court that the Bowmans' rights in the flagpole have vested pursuant to Code § 15.2-2311(C).

*Affirmed.*